IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

JAN MCRAVEN, GUARDIAN OF THE PERSON
AND ESTATE OF STEVEN MCFARLAND,
AN INCAPACITATED PERSON                                    PLAINTIFF

            vs.                CASE NO. 07-6019

LARRY SANDERS, INDIVIDUALLY AND
AS SHERIFF OF GARLAND COUNTY, ARKANSAS;
CAPTAIN MELVIN STEED, INDIVIDUALLY AND AS
JAIL ADMINISTRATOR FOR ADULT DETENTION FOR
GARLAND COUNTY, ARKANSAS; LT. JUDY MCMURRIAN
INDIVIDUALLY AND AS A SUPERVISORY OFFICER
FOR GARLAND COUNTY ARKANSAS; SGT. RONALD
RADLEY, INDIVIDUALLY AND AS 7am-3pm SHIFT
SUPERVISOR FOR THE GARLAND COUNTY ADULT
DETENTION CENTER; SGT. DONALD ANSLEY,
INDIVIDUAL AND AS 3pm-11pm SHIFT
SUPERVISOR FOR THE GARLAND COUNTY ADULT
DETENTION CENTER; DEPUTY JOHN DODGE,
INDIVIDUALLY AND AS AN OFFICER OF THE GARLAND
COUNTY SHERIFF'S DEPARTMENT; DEPUTY J.D. HENRY,
INDIVIDUALLY AND AS AN OFFICER OF THE GARLAND
COUNTY SHERIFF'S DEPARTMENT; AND NURSE TOMMY L.
HARMON, LPN INDIVIDUALLY AND AS NURSE FOR THE
GARLAND COUNTY ADULT DETENTION CENTER        DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Before the Court are remaining Defendants' Motion for Summary Judgment (Doc. 49), Plaintiff's Response (Doc. 58), and Defendants' Reply (Doc. 70). Forrest Marks and Nick Dodd were previously dismissed as Defendants (Doc. 41).

## A. Standard of Review

Summary Judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The burden of proof is on the moving party to set forth the

basis of its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The Court must view all facts and inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574 (1986). "The non-moving part[ies], however, must still 'present evidence sufficiently supporting the disputed material facts that a reasonable jury could return a verdict in [their] favor.'" *Pope v. ESA Services, Inc.*, 406 F.3d 1001, 1003-04 (8th Cir. 2005) (quoting *Gregory v. City of Rogers, Ark.*, 976 F.2d 1006, 1010 (8th Cir. 1992)).

**B. Facts**

The events of this case occurred following the arrest of Steven McFarland on the mid-morning of February 13, 2007. McFarland was arrested for Driving While Intoxicated-Drugs and placed in a holding cell in the Garland County Adult Detention Center. Later that afternoon, McFarland stopped breathing while in the cell and suffered severe brain damage. Due to McFarland's condition, this suit is brought by his mother.

All Defendants were either employees of the Garland County Sheriff's Office or the Garland County Adult Detention Center. It is undisputed that the Detention Center had a written jail medical policy for treating all inmate medical needs at the time of the incident. The Detention Center had an agreement with a doctor for jail visits, but there is no

2

evidence he had any involvement with this case. The Detention Center also employed Tommy Harmon, a Licensed Practical Nurse, from 8:00 am to 4:30 pm on weekdays. When Harmon was not at work, other employees did his job, dispensing medication and determining if inmates were in need of emergency medical care.

Sheriff Larry Sanders was the chief decision maker for the Garland County Sheriff's Office. Sanders was a certified law enforcement officer, but he had not received CPR training. Sanders helped promulgate the medical policies for the Garland County Detention Center.

Captain Melvin Steed was the Jail Administrator for the Garland County Adult Detention Center. Captain Steed was certified by the Arkansas Law Enforcement Training Academy concerning proper procedures for the operation of a Detention Facility. Steed was also a Certified Law Enforcement Officer, but he had not received CPR training. On February 13, 2007, Steed left the facility at the end of his shift at 3:00 pm.

Lieutenant Judy McMurrian was a Detention Facility worker who completed several State's Jail Standards Courses and other courses, but was not a certified law enforcement officer. She had not received CPR training. On February 13, 2007, McMurrian's shift was 11:00 am to 7:00 pm where she supervised inmates and officers during those swing shift hours, including her subordinates Sergeants Radley and Ansley.

3

Sergeant Ronald Radley was a Detention Facility Worker and shift supervisor for the 7:00 am to 3:00 pm shift on February 13, 2007. He completed a State's Jail Standards Course, but had not received CPR training. Radley left the facility when his shift ended at 3:00 pm, as Donald Ansley began his shift.

Sergeant Donald Ansley was a Detention Facility Worker, who completed a State's Jail Standards course and other jail courses, but was not a certified law enforcement officer. He received CPR training in 1994. On February 13, 2007, Ansley's shift was from 2:45 pm until midnight.

Deputy John D. Henry was a Detention Facility Worker at the Garland County Detention Facility. He completed a State's Jail Standards course and other jail courses and was also trained in CPR. Henry left the facility when his shift ended at 3:00 pm.

Deputy John T. Dodge was a Detention Facility Worker at the Garland County Detention Facility. He completed a State's Jail Standards course and other jail courses and was a certified law enforcement officer. He was also trained in CPR. Dodge left the facility when his shift ended at 3:00 pm.

Tommy Harmon was a licensed practical nurse who worked in the Garland County Detention Center from 8:00 am to 4:30 pm. As an LPN, Harmon received CPR training.

4

Forrest Marks is a Sergeant with the Arkansas state police. On February 13, 2007, Marks responded to the scene of an accident on Highway 5 North at about 8:31 am. Marks learned that a witness followed the person who caused the accident, later identified as Steven McFarland. Hot Springs Village Police stopped McFarland while Marks was still at the accident scene. Corporal Kelly Watkins transported McFarland from Hot Springs Village to the Garland County Sheriff's Department. On his Driver/Witness Statement Form filled out at 11:00 am, McFarland claimed he was sleepy, but not intoxicated on any substance.

Around 10:30 am, Officer Watkins brought McFarland to the Garland County Detention Center and turned him over to Deputy Dodge for booking. Marks asked Nick Dodd, a Drug Recognition Expert, to assist with the investigation. Marks ran a breathalyzer test on McFarland at about 11:15 that showed no alcohol, and Marks did not smell alcohol on McFarland. Based on McFarland's behavior, Marks believed him to be under the influence of some intoxicant, although not alcohol. Marks last saw McFarland before noon, and at that time he did not believe that he needed emergency medical care.

As part of Dodd's investigation, he took a urine sample that reported components of marijuana, benzodiazepines, and opiates. During Dodd's investigation, McFarland told Dodd that

he had taken Seroquel, Hydrocodone, Depakote, and Ambien. Dodd believed McFarland to be intoxicated, but not in need of medical attention. Following Dodd's investigation, Marks decided to arrest McFarland for DWI-Drugs, Driving Left of Center, Leaving the Scene of an Accident, Carrying a Weapon, and No Proof of Insurance. At about 12:30 pm, McFarland was booked into the jail and placed in the booking room holding cell, which also functions as the drunk tank. Marks stated that he did not believe McFarland needed medical care and did not inform anyone that he thought he needed medical care.

When McFarland arrived at the Garland County Detention Facility, he had a prescription for Chlorzoxazone, a muscle relaxer. That prescription had been filled the day before. The prescription was for ninety (90) tablets, but only sixty-nine (69) tablets remained in the bottle. McFarland also had bottles of Seroquel, hydrocodone cough syrup, and Alprazolam. The quantities remaining in the last three bottles are unclear

When Detention Facility personnel discovered that some twenty-one Chlorzoxazone pills were missing from the vial, Lieutenant Judy McMurrian advised Sergeant Ronald Radley that she wanted McFarland transported to the hospital for an evaluation. Radley convinced McMurrian to have Nurse Harmon examine McFarland for a medical opinion about whether McFarland needed to go to the hospital. McMurrian talked to

6

Deputy Henry about Harmon's exam of McFarland. Harmon determined that McFarland did not need to go to the hospital. At the time, neither Harmon nor McMurrian had been informed that McFarland did not have alcohol in his system. Harmon believed McFarland's behavior was primarily caused by alcohol.

A motion activated camera recorded McFarland's time in the holding cell. Once he entered the cell, McFarland swayed when he tried to stand upright and could not walk in a straight line. Shortly after McFarland was placed in the cell, he reclined on his side with his legs hanging off the bench. An unidentified person entered and checked on McFarland, and then Tommy Harmon, the licensed practical nurse employed by the jail, examined him. The extent of Harmon's examination is disputed. Based on his examination of McFarland, Harmon advised the other Detention Facility Workers that McFarland did not need to go to the hospital, and emergency personnel were not contacted. Harmon claims he took McFarland's blood pressure and pulse on several occasions and looked in on McFarland during the afternoon, but this is not apparent on the video. McFarland was then on his side with his legs hanging off the end of the bench; he went to sleep, snoring loudly. Defendants claim they checked on McFarland several times and that his snoring was a sign that he was sleeping off his intoxicant and still breathing. The video shows McFarland

7

moving only once after he went to sleep.

During the interim before sleep, McFarland exhibited symptoms of intoxication. Dodd's report lists slurred speech, poor coordination, flushed face, problems standing, and inability to walk a straight line. Once McFarland entered the holding cell, he only moved once, and stayed in approximately the same position. McFarland was snoring loudly, which the Plaintiff claims to be a sign of airway restriction.

Shortly before 5:00 pm, Brandon Runyon, another pre-trial detainee, was put in the holding cell with McFarland. At roughly 5:30 pm, Runyon walked over to McFarland, noticed he did not appear to be breathing, and began knocking on the door. Less than a minute later, Donald Ansley opened the door and looked at McFarland. The paramedics were called and arrived at 5:42 pm. During the seven minutes between the time Runyon reported McFarland's lack of breathing and the paramedics arrival, Ansley can be seen standing over McFarland with his hand on him and shaking him. Ansley claims he was checking McFarland's pulse and thought he felt a weak pulse. Ansley claims that his CPR training had taught him that CPR should not be attempted if the person has a weak pulse. Although others stood in the doorway to the cell, McMurrian was the only other officer to enter the cell until the paramedics arrived. It is undisputed that no one attempted CPR

8

before the arrival of paramedics. McFarland was transported to the hospital where he remained for an extended period of time. It is undisputed that McFarland suffered severe brain injury as a result of the drug overdose and airway blockage. The Plaintiff contends that the cause of McFarland's brain injury was lack of oxygen, not the drugs and that immediately performing CPR could have reduced or prevented McFarland's injuries.

It is undisputed that Sheriff Sanders had no contact with McFarland before he stopped breathing. Captain Melvin Steed had no involvement with McFarland during his incarceration other than reviewing reports.

Sergeant Radley and Lieutenant McMurrian had some contacts with McFarland and were aware of his condition. McMurrian talked to Radley and suggested that he might need to go to the hospital. Radley suggested that Nurse Harmon look at McFarland and give an opinion. McMurrian acquiesced. Radley could see McFarland sleeping on the video monitor.

Following the request by other officers, Harmon checked McFarland at about 12:20 pm in the holding cell. Harmon heard McFarland's snoring during the afternoon and was aware of his symptoms before he went home at 4:30 pm.

Deputy Henry was present during Harmon's examination of McFarland in the holding cell. Henry was also present in the

9

booking room while other officers were talking to McFarland.

Donald Ansley had some contact with McFarland before he stopped breathing. Ansley's shift did not start until 3:00 pm, but Ansley watched the video feed of the holding cell enough to determine McFarland had not moved in several hours. Once McFarland stopped breathing, Ansley entered the holding cell and attempted to wake McFarland. Ansley then attempted to find a pulse, and claims he found a weak pulse. This continued until the paramedics arrived.

When McFarland was booked into the Garland County Detention Center, State Police Officer Watkins turned McFarland over to Deputy Dodge. McFarland told Dodge that he had taken several Ambien. After placing him in the holding cell, Dodge heard McFarland snoring.

**C. Discussion**

42 U.S.C. § 1983 states that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State...subjects, or causes to be subjected, any citizen of the United States...to the deprivation of any rights,...secured by the Constitution and laws, shall be liable to the party injured in an action at law." The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such

10

deterrence fails. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

### 1. McFarland's Constitutional Rights.

The gateway question for a suit under § 1983 is whether the Plaintiff's constitutional rights were violated. For incarcerated inmates that have not received a formal adjudication of guilt, the Court applies scrutiny based on the Due Process Clause of the Fourteenth Amendment. *City of Revere, Mass. v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). However, the protections afforded by the Due Process clause are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id*. Therefore, Eighth Amendment caselaw is relevant for determining a constitutional violation.

For medical care to be so inadequate that it violates constitutional rights, the conduct of the prison officials must amount to "deliberate indifference to the serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Examples of deliberate indifference include intentionally denying or delaying access to medical care or interfering with prescribed treatment. *Id*. at 104-05. Deliberate indifference has both subjective and objective components. Plaintiffs must show "(1) that they suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those

11

needs." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). Negligence or medical malpractice are not constitutional violations. *Estelle*, 429 U.S. at 106. To be objectively serious, the medical need must be "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991). If the prison officials knew of a substantial risk to the health or safety of an inmate and respond reasonably, they are free from liability. *Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994).

In this case, McFarland's medical needs were not supported by medical evidence, such as a physician's diagnosis. It is undisputed that McFarland's medical needs were objectively serious after 5:35 pm, when Runyon noticed McFarland had stopped breathing. Therefore, the first issue is when did McFarland's condition become sufficiently serious to be obvious to the layperson, and whether it occurred before he stopped breathing. Before McFarland stopped breathing, at least one person, Lieutenant McMurrian, thought McFarland might require medical attention. Her doubts were assuaged by having Nurse Harmon look at McFarland. Based on McFarland's symptoms, Dodd's drug evaluation, McMurrian's concerns, the videotape of McFarland in the cell, and the affidavit of Mary

Priddy, who reviewed the case, there is a genuine issue of material fact as to whether McFarland manifested an objectively serious medical need before he stopped breathing.

The symptoms that McFarland demonstrated are not in dispute. The Court has seen evidence suggesting that John Henry, Judy McMurrian, Ronald Radley, Donald Ansley, John Dodge, and Tommy Harmon had sufficient contacts with McFarland to raise a fact issue about their knowledge of McFarland's condition. After making the required inference that McFarland had an objectively serious medical need, the Defendants' behavior could be seen as deliberate indifference. A genuine issue of material fact exists as to whether McFarland's constitutional rights were violated.

## 2. § 1983 Official Capacity Liability

For a municipality to be liable under § 1983, the municipality itself must cause the violation at issue. "*Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). Section 1983 liability attaches only when execution of the governmental entity's policy or custom causes the injury. *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658, 694 (1978) Because a municipality can act only through its employees, the municipality in question must be held liable for the acts of its employees executing the policy or custom.

13

"[M]unicipal liability may be imposed for a single decision by municipal policymakers." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). However, for a single incident of unconstitutional activity to impose liability, there must be separate proof of an existing, unconstitutional policy attributable to a municipal policymaker. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).

### a. General Municipal Liability Based on Policy or Custom

For municipal liability, a plaintiff must prove that a municipal policy or custom was the "moving force [behind] the constitutional violation." *Monell*, 436 U.S. at 694. To show a custom, three requirements must be proven in the Eighth Circuit:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> (3) The plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

*Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). The Eighth Circuit has further applied *Monell* to mean that a plaintiff must either show an official policy "or misconduct so pervasive among non-policymaking employees of the

14

municipality 'as to constitute a custom or usage' with the force of law." *Kuha v. City of Minnetonka*, 365 F.3d 590, 603 (8th Cir. 2003) (citing *Monell*, 436 U.S. at 691).

In this case, Defendants have submitted the written policies of the Garland County Detention Center concerning medical needs. Defendants have also attached affidavits claiming that no inmates were denied medical care. The Plaintiff seeks to establish a pattern of denial of medical care based on officers doing Nurse Harmon's job during the night, other assorted failures by Nurse Harmon, and the facts in this case. For the purposes of summary judgment, the Court takes these assertions of fact as true since they are supported by depositions and come from the non-moving party.

For § 1983 municipal liability on the basis of a general pattern of unconstitutional activity, there must be a pattern of unconstitutional misconduct. The Defendants have presented affidavits indicating no pattern of denials of medical care. The Plaintiff makes much of the fact that when Nurse Harmon was not there, other Sheriff's Department employees "did his job" and that there had been previous disagreements over medications for possible staph infections. The Plaintiff has submitted evidence indicating that Harmon had disagreements over the appropriateness of treating suspected staph infections, but that other officers watched him and made sure

15

his job got done. Having an officer dispense medication in the absence of a nurse is not a per se constitutional violation. The standard is not negligence, but deliberate indifference, and when jail employees reasonably attempt to take care of the medical needs of inmates, it shows that they are not deliberately indifferent.

The Plaintiff also claims that all the actions of Defendants towards McFarland collectively amount to a continuing, widespread pattern of unconstitutional misconduct. Even assuming a violation of McFarland's constitutional rights, that violation is one incident, not a pattern. For one incident to suffice for a general § 1983 violation, there must be a policy attributable to a municipal policymaker, which is not alleged.

The Defendants have produced evidence showing a lack of a pattern or policy of unconstitutional action, and the Plaintiff has failed to counter that evidence with any evidence of prior unconstitutional misconduct or a current policy of unconstitutional conduct attributable to a municipal policymaker. The Defendants have met their burden on summary judgment and Plaintiff's claims based on official capacity liability for a policy or custom of unconstitutional misconduct are dismissed.

### b. Failure to Train

16

A county or municipality may also incur § 1983 liability if a failure to train its law enforcement officers causes a constitutional violation. A municipal custom or policy may be inferred indirectly from acquiescence in a custom or policy. *See Jett v. Dallas Indepen. Sch. Dist.*, 491 U.S. 701, 737 (1989). Indirect inference of a custom or policy may come from a "failure by policymakers to train their subordinates amounting to 'deliberate indifference to the rights of those who come in contact with the municipal employees." *Davis v. Lynbrook Police Dept.*, 224 F.Supp. 2d 463, 478 (E.D.N.Y. 2002). "If a municipality fails to train its police force, or if it does so in a grossly negligent manner so that it inevitably results in police misconduct, the municipality may fairly be said to have authorized the violations." *Warren v. City of Lincoln, Neb.*, 816 F.2d 1254, 1263 (8th Cir. 1987).

Three requirements must be met for a municipality to be liable for a failure to train. First, the training practices must be inadequate. *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996). Second, the municipality must be deliberately indifferent to the rights of others in adopting those training practices, such that the "failure to train reflects a deliberate or conscious choice by a municipality." *Id.* Third, the alleged deficiency in the city's training procedures must actually cause the plaintiff's injury. *Id.*

17

Eighth Circuit precedent is reflected within the recent case of *Grayson v. Ross*. 483 F.3d 802 (8th Cir. 2006). In *Grayson* an individual was arrested after a car accident and suspected of drug intoxication. *Id.* at 806. The arrestee seemed relatively normal during the booking process, but later mutilated himself while in custody and died as a result of the drugs in his system. *Id.* at 806-08. In affirming the appropriateness of summary judgement on official capacity liability, the Eighth Circuit found that completion of the Basic Jail Standards course meant, as a matter of law, that the Jailers' training did not constitute deliberate indifference as required for official capacity liability. *Id.* at 811.

In our case, the alleged failure to train is lack of CPR and first aid training. The alleged constitutional violation is the denial of medical care in violation of the Fourteenth Amendment. For a municipality to be liable for a failure to train this in situation, the failure must actually cause the constitutional violation, which in this case is deliberate indifference to an objectively serious medical need. The lack of training must then be a result of deliberate indifference on the part of the municipality, which must cause deliberate indifference by an individual.

All of the Defendants had training for their jobs as a

18

Nurse, Jailers, or Law Enforcement Officers. Job trainings for all three jobs include at least some first aid. Because of *Grayson*, the Court concludes that the training of the relevant Garland County Sheriff's Office Employees was not so lacking as to constitute deliberate indifference on the part of the municipality. The Defendants have met their burden on summary judgment and Plaintiff's claims based on official capacity liability for a failure to train are dismissed.

### 3. Qualified Immunity and Individual Capacity Liability

Law Enforcement Officers have qualified immunity from liability in their individual capacity unless they violate a clearly established right of which a reasonable person would know. *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity means that Defendants must have "fair warning" that their conduct deprived someone of his constitutional rights. *See Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002). However, just because a situation is different than one squarely confronted by an earlier case, that does not mean that Defendants necessarily lack fair warning. *Id.* at 741.

The Eighth Circuit has described the inquiry into qualified immunity in inadequate medical care cases as

19

requiring three steps. *See Grayson*, 454 F.3d at 808-09. First, there must an objectively serious medical condition. *Id.* Second, the Defendants must actually know of but disregard, or act deliberately indifferent to, the Plaintiff's health or safety. *Id.* Third, "it must be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 809.

Supervisors face an additional possibility of liability under § 1983. Supervisors are liable for their subordinates' actions when their own inaction amounts to deliberate indifference. *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989). Supervisors are not liable under a *respondeat superior* theory. *Id.* For supervisory liability, the supervisor must either have known of the constitutional violation or should have known of the violation but recklessly disregarded the risk. *Id.* at 138. This standard of knowledge is more than negligence but less than actual intent to cause the violation. *Id.* "The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see." *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995). A single incident is usually insufficient for supervisory liability, but with several incidents, tacit authorization or reckless disregard becomes a plausible theory. *Howard*, 887 F.2d at 138.

20

When an inmate's behavior does not suggest a high degree of intoxication, summary judgment is appropriate on the basis of qualified immunity. *See Grayson*, 454 F.3d at 810. It is clearly established that it is a constitutional violation to be deliberately indifferent to the serious medical needs of the incarcerated. *See id.* Since the standard for an objectively serious medical condition is one that is either "obvious to the layperson or supported by medical evidence, like a physician's diagnosis," when an inmate's constitutional rights are violated by inadequate medical care, the violation is one of a clearly established right, and the third requirement is redundant when the first two requirements have been met.

A factual dispute exists as to whether McFarland had an objectively serious medical need in the hours before he stopped breathing. It is undisputed that Defendants did not provide McFarland medical treatment until he stopped breathing. Therefore, the issue as to whether or not to grant Summary Judgment for individual capacity liability is the subjective knowledge of each Defendant. Defendants cannot be deliberately indifferent to what they do not know. Summary Judgment is therefore appropriate for the Defendants who did not know of McFarland's symptoms.

It is undisputed that Melvin Steed had no contact or

21

involvement with McFarland during his incarceration. The Defendants have submitted evidence that shows this incident was isolated. Steed lacked the subjective awareness or reckless disregard necessary to constitute deliberate indifference both as a supervisor and as a detention facility worker. Plaintiff's claims against Steed in his individual capacity are hereby dismissed.

It is also undisputed that Sheriff Sanders had no contact with McFarland or reason to have had contact with him before he stopped breathing. Sanders arrived after the paramedics had been called and Sergeant Ansley, who had been trained in CPR, was standing over McFarland and checking for a pulse. Non-interference in the care being provided by another officer after paramedics have been called does not constitute deliberate indifference. If McFarland's constitutional rights were violated, it was not by Sheriff Sanders in his individual capacity. Sanders lacked the subjective awareness necessary to constitute deliberate indifference until McFarland stopped breathing. Sanders's actions after McFarland stopped breathing did not amount to deliberate indifference. Plaintiff's claims against Sanders in his individual capacity, both as a supervisor and based on his conduct alone, are hereby dismissed.

The depositions and affidavits of John Henry, Judy

22

McMurrian, Ronald Radley, Donald Ansley, John Dodge, and Tommy Harmon suggest that they possessed knowledge of McFarland's condition before he stopped breathing. Therefore, genuine issues of material fact exist both as to the objectively serious nature of McFarland's condition and these Defendants subjective knowledge of it. Genuine issues of material fact then exist as to whether these Defendants were deliberately indifferent to the serious medical needs of McFarland and thus liable in their individual capacities. These Defendants' Motion for Summary Judgment is denied and these Defendants are not entitled to qualified immunity.

### 4. The Arkansas Civil Rights Act

The Plaintiff alleges that the acts and omissions of the Defendants constitute a violation of the Arkansas Civil Rights Act of 1993. The language of the Arkansas statute largely tracks the language of 42 U.S.C. § 1983. *See* Ark. Code Ann. § 16-123-105(a). The two statutes are sufficiently similar that courts may use § 1983 decisions for guidance. *See* Ark. Code Ann. § 16-123-105(c). The important difference is that the Arkansas statute concerns violations of the Arkansas constitution while the federal statute concerns violations of the federal constitution. *See id.* The provision of the Arkansas Constitution that Defendants have allegedly violated is article II, section 9, which bans cruel and unusual

23

punishment. For cases involving unmet medical needs of pre-trial detainees, the Arkansas Supreme Court has adopted the deliberate indifference standard, which is the same as the federal standard. *See Grayson v. Ross*, 253 S.W.3d 428, 433 (Ark. 2007); *See also Grayson v. Ross*, 483 F.3d 887, 888 (8th Cir. 2007).

In this case, the claims against the Defendants under the Arkansas Civil Rights Act mirror Plaintiff's claims under § 1983. Given that the facts and the legal standards for both statutes are essentially the same, where Summary Judgment is appropriate under § 1983, it is also appropriate under the Arkansas Civil Rights Act.

**D. Conclusion**

Defendants have met their burden of showing no genuine issues of material fact for either municipal policy or custom or for a failure to train. Defendants Motion for Summary Judgment is **GRANTED** and Plaintiff's claims concerning official capacity liability both under § 1983 and the Arkansas Civil Rights Act are **DISMISSED**.

For individual capacity liability, it is undisputed that Defendants Melvin Steed and Larry Sanders lacked the subjective awareness, or reckless disregard, and the deliberate indifference necessary for a violation of McFarland's constitutional rights under a general theory or a

24

supervisory theory.  Defendants Steed and Sanders's Motion for Summary Judgment is **GRANTED** and Plaintiff's claims concerning individual capacity liability under both § 1983 and the Arkansas Civil Rights Act are **DISMISSED.**

As to Defendants John Henry, Judy McMurrian, Ronald Radley, Donald Ansley, John Dodge, and Tommy Harmon in their individual capacity, there are genuine issues of material fact whether McFarland's medical needs were objectively serious and whether Defendants were deliberately indifferent to them. Defendants John Henry, Judy McMurrian, Ronald Radley, Donald Ansley, John Dodge, and Tommy Harmon's Motion for Summary Judgment is **DENIED.** This case remains set for trial on October 27, 2008.

IT IS SO ORDERED this 21st day of October 2008.

<u>/s/ Robert T. Dawson</u>
Robert T. Dawson
United States District Judge

AO72A
(Rev. 8/82)